what has been received cannot be restored, so as to justify the equitable remedy of rescinding. At other times, if this court can, in a particular case, make an award of damages, as it sometimes does, it must be where part of the property can be restored, and damages allowed for the rest, or where a restoration is impossible through the wrong of the opposite side, or where jurisdiction exists, for other grounds and reasons, to proceed and give damages alone. Warner v. Daniels [Case No. 17,181]; 2 Story, Eq. Jur. § 794; 3 Merivale, 643. Whether damages alone could be given in equity, on the facts appearing here, or damages and a restoration of the drafts and notes, is very doubtful, if the bill was by Otis against both of these respondents. But it is quite certain that Simpson has no claim to such a decree, in a bill in the present form, and against both of them. His best chance for a recovery would seem, on the present evidence, to be in a bill against Wiggin alone, for his coöperation with Otis in representations in the sale at Detroit, as to the tobacco, which the plaintiff considers clearly exaggerated and untrue. But whether a recovery at all could then be had, or how much damages Simpson thus sustained, or what would be the true rule of damages then, and what the new evidence and principles to govern a recovery in such cases, different from those proper in a bill in form like this, and against Copeland, as well as Wiggin, cannot be properly decided now. But in order to leave the door entirely open for any other relief the complainant may be advised to attempt, I propose to let this bill be dismissed without prejudice.

An injunction now existing against the negotiation of the notes by Wiggin, it was allowed, on motion, that the decree of dismissal be not entered till the next term, in order, in the meantime, that new proceedings be instituted or the controversy arranged.

---

SIMPSON (WILSON v.). See Case No. 17,-834.

SIMPSON, The LOUISA. See Case No. 8,-533.

---

# Case No. 12,888.

## In re SIMS.

[16 N. B. R. (1878) 251.] [1]

### District Court, E. D. Michigan.

**BANKRUPTCY — MORTGAGE GIVEN AFTER COMMENCEMENT OF PROCEEDINGS—MOTION TO SET ASIDE.**

An assignee may petition summarily to set aside a mortgage given after the commencement of proceedings in bankruptcy. Resort to a bill in equity is unnecessary.

On petition of assignee to set aside mortgage. A creditor's petition was filed against Stephen Sims July 11, 1876. On July 20th

[1] [Reprinted by permission.]

he gave a mortgage to Atkinson & Atkinson, to secure their pay for services to be rendered by them in resisting the creditor's petition. He was duly adjudicated a bankrupt October 23d.

Burt & Burritt, for assignee.
Mr. Atkinson, in pro. per.

BROWN, District Judge. Respondents defended solely upon the ground that this court has no jurisdiction to proceed, summarily, to set aside the mortgage, and claim that the assignee must be driven to a bill in equity. In support of this position, the cases of Smith v. Mason, 14 Wall. [81 U. S.] 419; Marshall v. Knox, 16 Wall. [83 U. S.] 551; and In re Marter [Case No. 9,143], decided by this court, are relied upon. I am clearly of the opinion that these cases have no application to a proceeding like the one under consideration, where it is sought to set aside a mortgage given by the bankrupt after proceedings in bankruptcy have been commenced. The rule, in the opinions above cited, has been confined to cases where the adverse party claims an absolute title and dominion over the property of the bankrupt acquired by him prior to the proceedings in bankruptcy. The title of the assignee relates back to the commencement of those proceedings, and a mortgage upon the estate taken after that, is virtually an incumbrance upon the property of the assignee. While the taking of such mortgage is not unlawful, and the same would constitute a valid incumbrance upon the property, if the petition were dismissed, of course the mortgagee must assume the risk of being required to release it, if the petition is sustained. Where the property affected by the lien is confessedly the property of the bankrupt, and has passed to the assignee, and it only remains to ascertain and liquidate the alleged lien, the summary jurisdiction of this court is entirely adequate. In re Clark [Id. 2,801]; In re Ulrich [Id. 14,328]; Ex parte Bryan [Id. 2,061]. An order will be entered requiring the mortgagees to release the mortgage.

[See Case No. 12,889.]

---

# Case No. 12,889.

## In re SIMS.

[19 N. B. R. 57.] [1]

### District Court, E. D. Michigan.   June 24, 1878.

**BANKRUPTCY—MORTGAGE — GOOD FAITH—ACTUAL VALUE.**

When a bankrupt, within two months prior to the commencement of proceedings, had mortgaged his stock of goods, it being understood before the mortgage was executed that the consideration he received from the mortgagee should be paid to and accepted by a creditor then pressing the payment of a debt past due, for the same sum at which he received it, the mortgagee and the creditor being present and active in the negotiation with the bankrupt, the

[1] [Reprinted by permission.]

onus of showing "good faith" and "actual value" within the meaning of section 5128, Rev. St., will be upon the mortgagee, before he will be allowed to enforce his mortgage.

This cause came before the court upon the petition of the assignee for direction as to the distribution of the proceeds of the sale of certain property belonging to the estate and claimed to be covered by a chattel mortgage held by James Monaghan. It was referred to the register in charge to take proofs to be certified into court with his opinion thereon. On the 24th day of June, 1876, [Stephen] Sims gave to Monaghan four notes of five hundred dollars each, payable at 6, 12, 18, and 24 months, to secure the payment of which Sims gave Monaghan two mortgages, one on four and four-tenths acres of land in New Boston, and the other on his entire stock of merchandise, fixtures, furniture, etc., then in the store occupied by him. The last mortgage gave the mortgagee the right to take all the mortgaged property into his possession at any time when he should deem himself insecure. The consideration of these four notes—to secure the payment of which the two mortgages were given—was four hundred shares of the stock of the New York Silver Co. These notes and mortgages were executed at New Boston, the place where Sims was carrying on business as a country merchant. The circumstances under which they were executed were these: Mr. McCarthy, of the firm of McCarthy, Roney & Giles, accompanied by Monaghan, had come on the day of their execution to New Boston for the purpose of collecting or securing a claim of over two thousand dollars, some time past due, which the firm of McCarthy, Roney & Giles held against Sims. McCarthy states that he regarded the claim as a "dubious" one, and that he invited Monaghan to accompany him because he was conversant with legal forms. The negotiations which followed at New Boston were participated in by McCarthy, Sims, and Monaghan; and it resulted in the transfer by Monaghan to Sims of four hundred shares of the stock of the New York Silver Co., for which Sims gave his four notes of five hundred dollars,—two thousand dollars,—secured by the mortgages above mentioned, and the taking by Mr. McCarthy of the silver stock in full payment of Sims' debt to McCarthy, Roney & Giles. The concurrence of all three—Sims, McCarthy, and Monaghan—was necessary to the completion of the transaction. The mortgaged property remained in the possession of Sims until, in consequence of the bankruptcy proceedings which were commenced on the 11th of July following, they came into the hands of the assignee, who was appointed on the 23d of November following, and, as stated in the petition of the assignee, which is the subject of this reference, was sold on the 13th, 14th, and 15th days of March, 1877.

[See Case No. 12,888.]

H. E. Burt, assignee, in pro. per.
John Atkinson, for Monaghan.

By HOVEY M. CLARKE, Register:
The question is whether the mortgage to Monaghan was executed to secure the payment of a "loan of actual value, made in good faith," or whether it was executed to secure the payment of an existing indebtedness owing by Sims to McCarthy, Roney & Giles, and in violation of the provisions of sections 5128, 5129—one or both—of the Revised Statutes. That Sims was insolvent on the 26th of June, 1876, and that this insolvency was known to McCarthy, is established by the testimony. If the mortgages which were given to Monaghan for nearly the full amount of the debt of Sims to McCarthy, Roney & Giles had been given directly to them, the transaction would have been so clearly in violation of the provisions of the bankrupt act [of 1867 (14 Stat. 517)] that it is not probable that any attempt would have been made to sustain it. It is the interpolation of a sale of silver stock for two thousand dollars for notes and mortgages having 6, 12, 18, and 24 months to run; Monaghan, a third party, being the vendor of the stock, and the mortgagee of the debtor's property, which is relied upon to take the transaction out of the provisions of the bankrupt act, and thus render valid in the hands of Monaghan that which would have been void in the hands of the creditors. But it seems to me that the negotiations conducted between these three parties were essentially one; that every fact which was known to McCarthy, and which, because known to him, would bring the transaction within the inhibition of the bankrupt act, was also known to Monaghan; that Monaghan was there in the service of McCarthy, employed by him with express reference to the exigencies of the occasion, where a creditor is seeking to collect or secure a debt due to him by an insolvent debtor; that nothing appeared at the time, or in the testimony taken on this reference, to establish the "good faith" required by section 5128 of the transaction between Monaghan and Sims, essential to which, as it seems to me, was "actual value" in the subject of the traffic between them. The circumstances, indeed, did not require any consideration by Sims of the value of the silver stock; for the taking of it by McCarthy at one thousand dollars was a part of the negotiations by which Sims was to take it of Monaghan. In short, it seems clear to me that this transaction was such that Monaghan cannot claim rights under it severed from or apart from the consideration of the purposes and liabilities of McCarthy in it. I deem it sufficient to rest my opinion on the principle that the onus of showing, within the meaning of section 5128, "good faith" and of the "actual value" of that which passed first from Monaghan to Sims and from Sims to McCarthy is upon any party who

seeks, upon such a transaction as this is shown to be, to take the bankrupt's property out of the fund for distribution to the general creditors; and that, so far from such good faith being shown, all the testimony in the case tends in the opposite direction, and to show that it was a scheme devised by McCarthy and Monaghan on their way to and while at New Boston to obtain a lien upon all of Sims' property to secure the debt due to McCarthy, Roney & Giles, and at the same time evade the inhibition of the bankrupt act. It is by no means necessary, in order to reach the conclusion that this transaction cannot be supported, to affirm that any such tripartite agreement, even when it is clear that each part depends upon the others, and that the payment of a past-due debt by an insolvent is the result attained, that such transaction is a violation of the bankrupt act; but I think it may properly be held that the good faith of it must be affirmatively shown, and that essential to such a showing is satisfactory evidence of value in that which passes from the third party to the debtor, and from him to the creditor; and it entirely begs the question here raised to say that the creditor's receipt is evidence of such value.

I am therefore of opinion that no part of the money in the hands of the assignee, derived from the sale of the mortgaged property, should be paid to Monaghan.

June 10, 1878. The certificate was argued, and on the 24th of June THE COURT (BROWN, District Judge) directed an order to be entered approving the opinion of the register and confirming his report.

---

SIMS (GRAY v.). See Case No. 5,729.

---

# Case No. 12,890.

## SIMS v. JACKSON.

### [1 Wash. C. C. 414;[1] 1 Pet. Adm. 157.]

Circuit Court, D. Pennsylvania.   April Term, 1806.

SEAMEN—WAGES—DEATH DURING VOYAGE—FULL WAGES.

1. A mariner, who shipped to perform a voyage from Philadelphia to Batavia, and back to Philadelphia, at a certain rate of wages per month, having performed the voyage to Batavia, died there, and the vessel returned to the port from which she sailed. It was *held*, that the voyage was entire from Philadelphia to Batavia, and back; and that the monthly rate was no more than a rule to adjust the quantum for the voyage.

2. The expression, "full wages," in the seventh article of the laws of Oleron, means the same wages which the mariner would have been entitled to, had he lived, and served out the

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

whole voyage of the vessel to Batavia, and back to Philadelphia. It is the aggregate amount of the wages for the voyage; and, in this case, the administratrix of the deceased mariner, is entitled to the same wages the intestate would have received, had he lived and returned in the vessel, to the port from which he sailed.

[Cited in Natterstrom v. The Hazard, Case No. 10,055; Longstreet v. The R. R. Springer, 4 Fed. 672.]

[Appeal from the district court of the United States for the district of Pennsylvania.]

This was an appeal from the district court; where, upon a libel by the appellee, the executrix of her husband, for the wages, as mate on board a vessel, belonging to the appellant, for his full wages from Philadelphia to Batavia, and back, although he died at Batavia; the court decree accordingly. [He was hired for the whole voyage, at the rate of $30 per month. He was paid up to the time of his death.][2]

Mr. Moylan, for appellant, contended that, on common law principles, wages are the reward of services rendered; and, if not performed, they are not due. If a man is hired for a year, and die in the middle of it, only wages are due to the time of his death. 3 Vin. Abr. 5, 6, 13. If a mariner be impressed, wages are only payable, pro tanto. 2 Ld. Raym. 1211. That this is not a hiring for the voyage, but by the month; in the former case a gross sum is always stipulated. Abb. Shipp. 265, 273, 274. If this was a contract for the voyage, and not apportionate, nothing was due. Salk. 65. The true translation of the seventh article of the laws of Oleron, of what has been translated, "full wages," should be, "ready down." In 3 Bos. & P. 427, one judge was of opinion, that, if a sailor die on the voyage, his executors can only recover wages to the time of his death.

Mr. Milnor, for appellee.

WASHINGTON, Circuit Justice. As I entirely concur in the opinion given by the judge of the district court, upon this question, and for the reasons assigned by him, I deem it unnecessary to discuss the subject much at large. It is admitted, that no decision is to be met with in the English courts, precisely like the present; nor have we any municipal regulations, which govern the case. We must, therefore, resort to those marine laws, which have always been acknowledged as authority in England, as well as in most of the European commercial nations; unless, where they have been altered, or modified, by the laws of particular states; but which alterations are binding only on such states. The seventh article of the laws of Oleron declares; that, if a mariner be taken sick on the voyage, he ought to be put on shore, and care should be taken of him at the expense of the ship. When the vessel is ready to sail, she is not to wait for him; but, still, he is to be entitled to his full

[2] [From 1 Pet. Adm. 157.]